**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 28 2015 ☆

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------- x

UNITED STATES OF AMERICA,

-against-

HARVEY CHRISTIAN,
ANTHONY CHRISTIAN,
and
JASON QUINN,

                         Defendants.

------------------------------------------------------- x

**AMENDED
MEMORANDUM &
ORDER**

11-cr-425 (ENV)

VITALIANO, D.J.,

On October 27, 2014, a jury returned a verdict convicting Harvey Christian, Anthony Christian, and Jason Quinn of racketeering and racketeering conspiracy (Counts One and Two), conspiracy to distribute cocaine, cocaine base, and marijuana (Count Three), and the unlawful use and possession of firearms in furtherance of those racketeering and drug trafficking crimes (Count Six). In addition, Anthony Christian was convicted of the murder in aid of racketeering of Jerome Estella, also known as "Boo Boo" (Count Four). Harvey and Anthony Christian were convicted of conspiracy to murder William Jones, also known as "Buddha," in aid of racketeering (Count Five), and possession and distribution of cocaine base (Count Eight). Jason Quinn was separately convicted of distribution of and

conspiracy to distribute cocaine base (Counts Seven, Nine, and Eleven), and unlawful use of a firearm in furtherance of a drug trafficking crime (Count Ten).

Following the verdict, defendants' respective counsel moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, challenging the sufficiency of the evidence to prove each count, and, in the alternative, sought a new trial pursuant to Rule 33. For the reasons that follow, the motions are denied.

## The Evidence: A Neighborhood Under Siege

The charges tried in this case arose out of an investigation of suspected narcotics trafficking in the Park Hill neighborhood of Staten Island. Each of the three defendants were alleged to be leading drug distributors in Park Hill. The evidence at trial consisted, principally, of testimony from cooperating coconspirators, law enforcement officers, and former members of rival drug organizations who also had cooperation agreements.

The evidence vividly chronicled the takeover of a discrete Staten Island neighborhood by fear, guns and violence. It told of the establishment of a secure fiefdom in which the racketeers could control the trafficking in narcotics, especially crack cocaine, and of the maintenance of their criminal empire by murder and mayhem.

Covering a period from the early 1990s through 2011, the year of their arrest in this case, the government educed plentiful proof to show that defendants had created and participated in what the government calls the "Park Hill Enterprise." It was one of several groups warring to control the sale of narcotics in the Park Hill neighborhood. More than one witness testified to buying and dealing crack with and for the defendants.

The brothers Christian, Harvey and Anthony, ran the racketeering organization that was also known by their family name. A co-conspirator, James Bestman, testified that he sold drugs with the Christian brothers in 1991 at or near the 55 Bowen Street apartment building where the Christian brothers then lived; that they pooled their money to buy drugs and that they had organized themselves to buy it from a single supplier, Leon Lewis. Tr. at 106. Bestman also testified that he met Jason Quinn in the early 1990s, and would see him at 55 Bowen with the Christian brothers. Tr. at 99-100. He described Harvey Christian as a "natural leader" who would "recruit people to work for us" in their drug trafficking enterprise. Tr. at 112-13. Bestman also acknowledged he worked with the Christian brothers to reach customers at 160 Park Hill Avenue, a "freelance" building. Tr. at 114. Bestman explained how he would make hand-to-hand drug sales while Anthony and Harvey Christian physically blocked rival dealers from interfering. Tr. at 114-

3

15. Bestman's description of the operations of the Park Hill Enterprise was corroborated by others. Paul Ford, also known as "Uncles," a violent drug trafficker in his own right and a cooperating witness too, testified that he saw the Christian brothers' crack-selling operation at 55 Bowen in the early 1990s.

A short time later, the Christian brothers lost their foothold at 160 Park Hill Avenue, and moved those operations elsewhere. Tr. at 122-27. They soon came to "control" 240 Park Hill, meaning that, through violence and threats of violence, only their enterprise could deal drugs in or around that building. But, 240 Park Hill was not a lone outpost after it was taken over by the Park Hill Enterprise. Brian Humphreys, a one-time "enforcer" for a rival gang, testified, as yet another cooperating witness, that he saw the Christian brothers selling crack cocaine during this period at 55 Bowen and 225 Park Hill as well. In fact, he stated that he understood the Christian brothers controlled 55 Bowen and 225 Park Hill at the same time. Tr. at 404-05.  In 1994, however, the Christians lost control of 240 Park Hill Avenue. Tr. at 134-40; Tr. at 837-40. It was only a setback.

A parade of violent combatants, all testifying under the security blanket of a cooperation agreement, described in gory detail for the jury the turf wars fought on the streets, in the hallways and on the roofs of Park Hill. The most notorious theater of war for the army of thugs, gunmen and drug dealers that

was the enterprise commanded by Harvey and Anthony Christian was the 1994 battle known as the "260 Wars," that is, the war for control of the neighboring building located at 260 Park Hill Avenue. There were numerous skirmishes and a colossal pitched battle.

Lamar Goodwine, a rival gang member, told the jury that he had engaged in numerous violent shootouts with the Christian brothers and Quinn. Describing a scene perhaps not believable if staged in a Hollywood movie, Goodwine spoke of a rooftop shootout with the Park Hill enterprise army. The rival sides, he said, fired weapons at each other from 225 and 260 Park Hill Avenue. Tr. at 1123-24. Paul Ford, who, at various times, was a member of the Park Hill enterprise, joined the Christians at the battleground. He testified that, as the bullets flew, he saw Harvey and Anthony Christian dashing from the 260 Park Hill Avenue building to their stronghold at 55 Bowen Street, and that Harvey was brandishing an AK-47. Tr. at 841. He also told the jury that Anthony and Harvey Christian later told him that they had been present and firing weapons during the shootout. Tr. at 844.

Yet another shootout was corroborated by police testimony and frantic 911 calls from frightened residents. When the smoke cleared, 77 spent bullet cartridges were retrieved by police, who also found the dead body of John Kennedy, a friend of the Christian brothers, at the scene. Tr. at 341-77; 2325-

26.

The roiling of the Park Hill neighborhood continued for years after the 260 Wars. One or another of the combatants, including the Christians, would shuffle off to jail and various alliances and supply arrangements would be made and would be broken. Following the war, for example, Ford and the Christians entered into an arrangement in which Ford would supply drugs to the Christians, which they would sell and share the profits with Ford. Tr. at 848-50. Continuing to actively manage their business and looking for every advantage, in 1997, the Christians sought to consolidate their violent control of their turf by joining the Bloods gang. Tr. at 853, 855. In addition to making them more powerful figures, as one of their violent cohorts, Anthony "N.O" Britt, but another cooperating witness, testified, the Bloods connection also made cheaper crack supply prices available to them. Tr. at 1664-65. By 1998, the enterprise had gained "control" of 260 Park Hill. Tr. at 1131, 1133-34.

Brian Humphreys, known as "Trev," was brought into the fold in 1999 by the Christians to be the enterprise enforcer. Likely the most cold blooded of the entire crew called to testify by the government as cooperating witnesses, Humphreys used robbery and violence to eliminate the competition. Tr. at 437-40. As he told the jury, he was directed by Anthony Christian to murder Corey "Shank Bank" Brooker, one of the enterprise's rivals. Tr. at 437-40.

The attempt failed. But, in the logic of the underworld, Humphreys concluded that one of Brooker's associates had to be eliminated if he were to get a shot at the target Anthony Christian had given to him. This led to Humphreys firing a hail of bullets that cut down Jerome "Boo Boo" Estella on the streets of Park Hill in broad daylight. Immediately after mowing down "Boo Boo," Humphreys said he went directly to Anthony Christian's apartment in 55 Bowen to return the gun he had used in the killing. Tr. at 442-60. Ford would also confirm it all by telling the jury that Anthony Christian had told him that Humphreys was Boo Boo's killer. Tr. at 858-59.[1]

The 1990s drug racketeering activities of the Park Hill enterprise led by the Christians carried over well into the new millennium. The jury heard blood-chilling accounts of control by violence and brazen disrespect for lawful authority. Awie Kwollie testified that, in 2004, when he could not pay for the marijuana he had been sold by Anthony Christian, Anthony assaulted him in

---

[1] The accounts of the turf wars of the 1990s were well supported by other evidence introduced at trial. There was the tale of the 1999 discovery by police of drugs and firearms found secreted in the lobby of 55 Bowen. Tr. at 1309-11. Another cooperating witness, Amos Boone, known on the street as "Peanut," told of crossing paths with the Christians in 2000, and knowing then that Anthony Christian was a Blood and that the brothers were very successful crack dealers in Park Hill. Tr. at 1445-46; 1468-70. Anthony told him, he said, that he sold drugs at 55 Bowen, was fighting to control more turf, and that he had been involved in the great shootout at 260 Park Hill Ave. Tr. at 1448-49. Harvey also told Boone of his warfare with Shank Bank. Tr. at 1468-70; see infra, Part A(1)(d).

the lobby of 55 Bowen. Tr. at 1278-79. Kwollie fought back but was immediately confronted by more enterprise soldiers, including Harvey Christian, and received more than 50 stitches to close the resulting stab wound in his neck. Tr. at 1282-83.

A few months later, in 2005, the Christian brothers interfered with the attempted arrest of three men loitering in the lobby of 55 Bowen. Tr. at 1953. The jury was told how Harvey Christian prevented police officers from handcuffing the third suspect. Harvey Christian announced loudly to the police that they could not make the arrest. Tr. at 1953 ("What are you doing? You're not arresting them."). Anthony then physically blocked the two police officers from pursuing the fleeing suspect. Tr. at 1954. The Christians and a group of about 20 the Christians led taunted the officers, challenging them to return and to try to arrest them. Tr. at 1954. Reinforced, the police did return to 55 Bowen to arrest the Christians for obstructing the earlier arrests. Tr. at 1956. They resisted. Pepper sprayed, Harvey fled down a stairway but was able to slam one of the pursuing officers into a wall, which resulted in the officer's hospitalization. Tr. at 1956-59.

The government provided proof through live testimony, wiretaps and consensual surreptitious video recordings that permitted a reasonable jury to conclude beyond a reasonable doubt that the enterprise's hallmark use of

8

drugs, guns and violence continued right down to the time of the arrests made in 2011. Boone, for example, testified that, in 2009, he observed a street exchange in street lingo between Harvey Christian and Anthony Britt regarding a firearm that was to be passed to Britt. Tr. at 1501-02. He then saw Britt retrieve a weapon placed on the tire of a parked car exactly where Harvey Christian had said it would be found. Tr. at 1502-03.

Cooperating witnesses who, in this pre-arrest era of the racketeering enterprise, were drug suppliers, described those arrangements for the jury. Paul Ford testified that he was one of the crack suppliers, in 2010 and 2011, not only for the Christian brothers but also for their affiliate, Jason Quinn. Tr. at 816-17. Felix Grant, another crack supplier, testified that he wholesaled to Harvey Christian on at least 15 occasions in 2011. Tr. at 2043. Often, those drugs were picked up by lower-echelon workers for the racketeering enterprise, usually Robert "Boy Boy" Fields and Jamie "Mo Mo" Booker. Tr. at 867-75; 1689-91. It was Harvey Christian who introduced Quinn to Grant, telling Grant that he needed drugs for "his man." Tr. at 2046-47. For three or four months thereafter, Quinn would call Grant directly to make purchases of cocaine. Tr. at 2047-48.

And, there was still more for the jury to consider. Another cooperating witness, William Cothren, stepped forward to proclaim that he was a drug

seller for the racket in 2011. Tr. at 1359. He testified that the enterprise still controlled 55 Bowen then. Tr. at 1342-43. He told the jury how he sold crack with Harvey Christian. Tr. at 1342-43. He described how he had packaged marijuana with Anthony Christian. Tr. at 1359. He told about Booker delivering a firearm to him, which the Christians told him to hold and then had him redeliver on their instructions. Tr. at 1371-74.

The year 2011 brought other episodes demonstrating how entrenched the racketeering enterprise run by the Christian brothers, with its ever expanding entanglements, was in the Park Hill neighborhood. The jury heard of the parking lot shootout between Anthony Christian and William Jones, also known as "Buddha," which, as Ford testified, occurred after the Christians told Ford that they were having big-time trouble with Buddha. Tr. at 861-64. The jury heard recorded phone conversations between Harvey Christian and Jason Quinn discussing the relative merits of the packaging and sale of various quantities of crack cocaine in their marketplace. Gov. Ex. 800(a)-4; Gov. Br. at 17. There were recorded conversations played for the jury in which Quinn and Grant discuss a drug delivery Quinn was expecting from him. Gov. Br. at 19. Recorded conversations between Harvey Christian and Quinn discussing supply problems following Grant's arrest were also played for the jury. Gov. Ex. 800(a)-50; Gov. Br. at 19-20. Lastly, of course,

the jury heard of the arrests that were made in 2011. That evidence was highlighted by the arrest of Jason Quinn because it was in the course of that arrest that cocaine, drug packaging paraphernalia and a strategically located and loaded firearm were seized and later received in evidence at trial.

It is on the totality of this evidence, viewed in the light most favorable to the verdict, that the motions must be judged.

<u>Legal Standards</u>

A. <u>Motion for Judgment of Acquittal</u>

Empowered by Fed. R. Crim. P. 29(a), the trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In a challenge to the sufficiency of the evidence, "a defendant bears a heavy burden." <u>United States v. Hamilton</u>, 334 F.3d 170, 179 (2d Cir. 2003). In fact, a conviction *must* be upheld if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original). All permissible inferences must also be drawn in favor of the government, including determinations of a witness's credibility inherent in the verdict. <u>See id.</u>; <u>United States v. Parkes</u>, 497 F.3d 220, 225 (2d Cir. 2007); <u>United States v. Temple</u>, 447 F.3d 130, 136–37 (2d Cir. 2001). The credibility of accomplice

11

witnesses is not excluded from that calculus. Indeed, accomplice testimony alone may support conviction so long as it is not "incredible on its face" and is "capable of establishing guilt beyond a reasonable doubt." United States v. Florez, 447 F.3d 145, 155 (2d Cir. 2006) (quoting United States v. Parker, 903 F.2d 91, 97 (2d Cir. 1990)). Similarly, circumstantial evidence alone can form the basis of the jury's verdict. United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1999).

A defendant's burden is even heavier in the case of a conspiracy conviction, where "deference to a jury's findings is especially important . . . because a conspiracy is by its very nature a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." United States v. Snow, 462 F.3d 55, 68 (2d Cir. 2006) (quoting United States v. Morgan, 385 F.3d 196, 204 (2d Cir. 2004)). A defendant may be guilty of conspiracy "even if he knows only one other member of the conspiracy, and a single act may be sufficient for an inference of involvement in a criminal enterprise . . . if the act is of a nature justifying an inference of knowledge of the broader conspiracy." United States v. Huezo, 546 F.3d 174, 180 (2d Cir. 2008) (quoting United States v. Tramunti, 513 F.2d 1087, 1112 (2d Cir. 1975)).

B.    Motion for New Trial

Rule 33 allows the trial court "to vacate any judgment and grant a new

trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). It is a motion separate and distinct from one for judgment of acquittal. The Second Circuit has held that, in considering a motion for a new trial, "the court is entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" United States v. Robinson, 430 F.3d 537, 543 (2d Cir. 2005) (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)). On the other hand, the trial court may not wholly usurp the jury's role, and it is only "where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000) (internal quotations omitted); Robinson, 430 F.3d at 543. Thus, while a decision to grant a new trial is reviewed for an abuse of discretion, United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001), the trial court's freedom to reverse the credibility assessments of the jury is limited.

Put another way,

Manifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful, unless the judge is prepared to answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?" In making this assessment, the judge must examine the totality of the case. All the facts and circumstances must be taken into account. An objective evaluation is required. There must be a real concern that an innocent person may have been convicted. It is only when it

13

appears that an injustice has been done that there is a need for a new trial "in the interest of justice." Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 [of the Federal Rules of Criminal Procedure] than to grant a motion for a judgment of acquittal pursuant to [Rule] 29 [of the Federal Rules of Criminal Procedure], where the truth of the prosecution's evidence must be assumed, that discretion should be exercised sparingly.

United States v. Bell, 584 F.3d 478, 483–84 (2d Cir. 2009) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) (alterations in original)).

## Discussion

### A. The Rule 29 Motion

#### 1. Racketeering and Racketeering Conspiracy (Counts One and Two)

##### a. Enterprise Membership and Continuity

Anthony Christian's Rule 29 motion, which Harvey Christian and Jason Quinn join to the extent it is relevant to them, argues that the evidence presented at trial was insufficient to support their convictions of racketeering and racketeering conspiracy. Defendants contend that all the government had proven was "a series of unconnected conspiracies to sell varying amounts of drugs in various places by a constantly changing core of sellers," because, "[w]ith the exception of defendants Harvey and Anthony Christian, no other person was involved or associated with the enterprise for longer than 2 years and no proof was offered of the existence of the enterprise between 2000-2001 and 2010." AC Br. at 2.

14

The crime of racketeering requires proof of participation in the affairs of an enterprise, 18 U.S.C. § 1962(c), in contradistinction to a charge of racketeering conspiracy, which requires proof of an agreement to participate in the affairs of the enterprise, 18 U.S.C. § 1962(d). Gov. Br. At 3. An enterprise may consist of "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose." Boyle v. United States, 556 U.S. 938, 948 (2009). However, it need not be "comprised of a fixed membership throughout its existence," Jones v. United States, No. 3:12-CV-601, 2014 WL 6871198 at *5 (D. Conn Dec. 5, 2014); members may leave or join at any point during the enterprise's existence. United States v. Mayes, No. 12-CR-385, 2014 WL 3530862 at *2 (E.D.N.Y. July 10, 2014) ("[A]n enterprise can function as a 'continuing unit' even if the membership changes during the period charged.").

To qualify as a "continuing unit," the enterprise need not be engaged in incessant activity. "While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." Boyle, 556 U.S. at 948; see also United

15

States v. Burden, 600 F.3d 204, 216 (2d Cir. 2010).

At trial, no less than eight government witnesses testified to defendants' involvement in the ongoing drug distribution enterprise. That the enterprise had a constantly changing membership, and had breaks in operations, does nothing to shake the foundation of defendants' convictions on those counts. [2] The testimony of those witnesses, in detailing, for example, how the enterprise "controlled" drug sales at 55 Bowen Street, described the small army of confederates tasked with various duties essential to maintaining that control. The glimpses these witnesses provided to the jury from different vantage points and at different times over the entire charged period of the enterprise showed a uniformity of purpose and method and ample proof of the enterprise's continuing existence throughout. Therefore, the evidence presented at trial was clearly sufficient to establish a drug-distribution

---

[2] In his submissions, Quinn argues that the government is required to prove that he "directed, "operated or managed the charged enterprise." JQ Br. at 3-5. However, as the Court instructed (and re-instructed) the jury:

> The government is not required to prove that a defendant was a member of the management of the enterprise . . . . [A]n enterprise is "operated" not just by management but also by lower-rung participants in the enterprise who are under the direction of management or carry out its orders. In other words, all that participate in the conduct of the enterprise, whether they are generals or foot soldiers, are responsible for the affairs of the enterprise.

Tr. 2682-83; see also Tr. at 2778-79. His argument fails.

enterprise operated, at least in part, by defendants as a cohesive racketeering unit.

### b. Quinn's Involvement in the Racketeering Conspiracy

In his Rule 29 motion, Jason Quinn aims his attack at the sufficiency of the government's evidence to prove racketeering acts one and three—which charged Quinn with conspiracy to distribute crack cocaine and powder cocaine—and racketeering act six and count seven—which charged Quinn with possession with intent to distribute a small amount of crack on or about April 4, 2011. Quinn claims that the only evidence supporting his conviction consists of a wiretapped phone call in which Harvey Christian and Quinn discussed possession of crack cocaine, but did not indicate they possessed the crack on that particular date. He argues that the government conceded as much when it stated to the jury, in its closing, that "the government need not prove that Jason Quinn possessed crack cocaine with intent to distribute it on April 4th, 2011." Tr. at 2364-65. Read in context, though, this statement was meant to clarify to the jury that "the dates in the indictment are approximate, and it does not matter if the evidence established at trial indicates that, in fact, a specific act took place on a date other than the date alleged in the indictment, as long as the dates are similar." Tr. at 2364. Of course, as the government readily acknowledged to the jury, "the government must prove . .

. that the defendant . . . possessed cocaine base or crack cocaine." Id.

Quinn might quibble about the government's summation, but cannot quibble about the power of the evidence. It is abundantly clear that the tapped April 4, 2011 phone call presented at trial provided a sufficient basis for the jury to find that Quinn possessed cocaine with the intent to distribute it on or about that day. The following excerpt, in which Quinn discusses drug-dealing strategy with Harvey Christian, demonstrates as much:

> QUINN: So I'm like I'll make you all wanna get the 50. That back and forth shit is what brings niggas more exposure to go to jail. So if they use – I'm just saying, if you got them used to big – it'll be – maybe not if you just show them – put it with the big – split the chunky 50s. But the motherfuckers is used to coming for dubs, they might not really be going for that shit. See, my shit was – my dubs – I came – I started in the dubs with small already. So it ain't really changed that much, they just a little bit bigger than before, but the 50s is mad chunky. The 50s is like three – almost three – almost more than three 20s now, about three 20s. It's like the same thing they was gonna get it I was giving a little play. But it's a gimmick so this shit go. But if your shit is already mad big –
>
> HARVEY CHRISTIAN: Oh.
>
> QUINN: -- but you could do it. I mean, the shit went before when he made a note off a 10, even though you got complaints. I think the complaints is from when he was selling 50s. Them 50s was looking fucked up. A 20's a 20, yeah, but the bag is mad big and it's mad space. Them shits is how your 20s was looking before. You can't – that's what I'm saying. You can't sell a nigga something for 50 that you was giving them for 20.

Gov. Ex. 800(a)-4; see Gov. Br. at 17. Less than two weeks later, another

18

tapped phone call followed a similar script:

> HARVEY CHRISTIAN: Hello?
>
> QUINN: Yo, what up?
>
> HARVEY CHRISTIAN: What's going on?
>
> QUINN: Yo, yo yo your man gonna make me hurt him, dawg.
>
> HARVEY CHRISTIAN: Who?
>
> QUINN: Yeah, it's the dude we was talking about. I don't wanna say his name right now, but the dude, the dude you was talking about going to get, yo, son, yesterday I was gonna tell you to, like, not, chill, don't get the nigga, 'cause, you know, we need him. Dawg, I had, I got some yesterday. Got mad complaints, right?
>
> HARVEY CHRISTIAN: Yeah.
>
> QUINN: The shit is soda'ed up, so I'm like I'm looking – I ain't really look too close at it. Boom boom, I could barely cut it. So I got hit my bottom bitch, you know what I'm saying, that keeps it at 100. Then I hit another bitch. The bitch I hit, she calls me back popping shit, yo, how the fuck you did this to me? I'm like, yo, hold the fuck up, man.

Gov Ex. 800(a)-16; Gov. Br. at 18-19.

In addition to these calls, the government tapped phone calls between Quinn and Felix Grant in which the two discussed buying and selling another batch of narcotics. Gov. Ex. 801(a)-1. When Grant, also known as "Pook," was arrested on June 4, 2011, the government overheard this phone conversation between Quinn and Harvey Christian:

> HARVEY CHRISTIAN: Yo.

QUINN: Yo. Yeah, you got your work?

HARVEY CHRISTIAN: Yeah.

QUINN: Yo, let me, let me hold seven, man.

HARVEY CHRISTIAN: I don't got none right now, man.

QUINN: Nobody do?

HARVEY CHRISTIAN: Nah.

QUINN: I don't know what the fuck I'm gonna do.

HARVEY CHRISTIAN: I don't know how Pook got jammed up like
that, man.

QUINN: It's fucking crazy and lazy. Yeah, being lazy.

HARVEY CHRISTIAN: Silly ass nigga.

QUINN: And real lazy.

Gov. Ex. 800(a)-50; Gov. Br. at 19-20. Four days after that conversation, on
June 8, 2011, Quinn was arrested at his home. In the course of effecting his
arrest, agents found in his residence units of crack cocaine packaged for
resale. Gov. Ex. 600, 601, 602, 606; Gov. Br. at 20. Surely, on the strength of
the intercepted conversations and the seizure of crack and drug trade
paraphernalia at his home, the jury was presented with sufficient evidence,
even without the quite damaging accomplice testimony that provided more, to
permit it to reasonably find that Jason Quinn was dealing crack on or about
April 4, 2011.

Quinn fares no better on the defense at law he interposes. His claim that the government failed to prove that he "directed," "operated or managed the charged enterprise," is immaterial. As reflected in the Court's instructions to the jury at the close of the case, the government was not required to prove that Quinn had played anything more than a participatory role, even at the lowest level. See Tr. at 2682-83 ("The government is not required to prove that a defendant was a member of the management of the enterprise . . . an enterprise is "operated" not just by management but also by lower-rung participants in the enterprise . . . . In other words, all that participate in the conduct of the enterprise, whether they are generals or foot soldier[s], are responsible for the affairs of the enterprise."); see also Napoli v. United States, 45 F.3d 680, 683 (2d Cir. 1995) (quoting Reeves v. Ernst & Young, 507 U.S. 107, 184 (1993)).[3]

### c. Quinn's Involvement in the 260 Wars Murder Conspiracy

Quinn objects that the government presented insufficient evidence for a

_____

[3] Quinn also argues there was insufficient evidence showing racketeering acts one, six, and eight were "vertically" related, meaning, connected to the enterprise. See JQ Br. at 5-6. His argument is belied by the evidence presented at trial, which demonstrated a clear nexus between Quinn's longtime association with the Christian brothers and his performance of the individual racketeering acts. See Tr. at 824 (Paul Ford's testimony that he regularly saw Quinn with the Christian brothers at 55 Bowen); Tr. at 1123-24 (Lamar Goodwine's testimony that he saw Quinn discharging firearms alongside the Christian brothers from a building rooftop during the 260 Wars); see also infra, Part A(1)(c).

reasonable jury to conclude, as the jury did in its answer to special interrogatories on the verdict form, that Quinn aided and abetted the possession and discharge of a machine gun (Count Six). He argues that "there was no evidence that Quinn *actively* aided and abetted the deployment of a firearm, much less a machine gun, as required by this Court's jury instructions," JQ Br. at 4 (citing Tr. at 2721) (emphasis added). The Second Circuit has written on this slate. In United States v. Gomez, 580 F.3d 94, 103 (2d Cir. 2009), the court of appeals affirmed the defendant's conviction for aiding and abetting the use of a firearm due to the "critical supportive role" he played in the armed robbery as a whole (he was a lookout at the scene). Here too, there was evidence that showed Quinn was present at and a most active sidekick for the Christian brothers during the shootout on the Park Hill rooftops. See Tr. at 1123-24 (Lamar Goodwine's testimony that he saw Quinn's rooftop discharge of firearms alongside the Christian brothers during the 260 Wars). Crediting the testimony of Quinn's involvement in the 260 Wars, the jury could have fairly concluded that, by standing with him in a shooting war, Quinn aided and abetted Harvey Christian's brandishing of the machinegun. See United States v. Davis, 996 F. Supp. 2d 225, 236 (S.D.N.Y. 2014) ("Since Davis conspired to take part in the robberies at the time the gun was to be brandished, he was to aid and abet his co-conspirator's brandishing

of the gun by playing a supportive role.").

Quinn goes on to argue "there was no basis for the jury to conclude that Quinn possessed the requisite advance[d] knowledge that a machine gun would be deployed." JQ Br. at 4-5. While it is true that the government's evidence on this count consisted solely of Lamar Goodwine's testimony, it was credible and, apparently, believed by the jury. It was also enough to establish guilt beyond a reasonable doubt. The Goodwine testimony that Quinn marched to the battlefield with the Christians just minutes before the gunfight started and that he remained with them from the start was sufficient to permit the jury to draw the reasonable inference that Quinn had advance knowledge of the available weaponry and that a machinegun would be used in the gunfight and in furtherance of the conspiracy. As it is not proper for the Court to second guess the jury's credibility findings, the Court does credit Goodwine's testimony and concludes there was sufficient evidence to convict Quinn on this count.[4]

> ### d. Conspiracy to Murder Corey Brooker and the Murder of Jerome Estella in Aid of Racketeering

Anthony Christian asks the Court to overturn his conviction of

---

[4] In somewhat of a sidebar to this point, Quinn accuses the government of having "apparently manipulated the testimony of cooperating witness Lamar Goodwine regarding the shootout in Park Hill that supposedly involved defendant Quinn." JQ Br. at 8 n.1. His request for a Kastigar hearing on this ground is discussed infra, Part B(4).

23

conspiracy to murder Corey Brooker ("Shank Bank") and the murder of

Jerome Estella on the ground that Brian Humphreys's and Paul Ford's

respective testimony was incredible as a matter of law. AC Br. at 5-6. As noted

earlier, it is not the role of the trial court to assess the credibility of a witness:

that is within the purview of the jury as sole finder of fact. See United States v.

Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (holding that, when deciding Rule

29 motions, "courts must be careful to avoid usurping the role of the jury").

At best, the Court's role is to affirm that the challenged accomplice testimony

was not incredible as a matter of law. And, it was far from that. This

argument, therefore, lacks merit and is dismissed.[5]

       e.    Conspiracy to Murder William "Buddha" Jones

Anthony Christian next asks the Court to overturn his conviction on the

charge of conspiracy to murder William "Buddha" Jones, claiming that the

murder was attempted for personal reasons, and not for the purpose of

reinforcing the racketeering enterprise by defending its "turf." AC Br. at 5.

The key prosecution witness on this charge, Anthony Britt, testified, and the

---

[5] In more critical analysis, the government points out that Humphreys's and
Ford's testimony was generally consistent in regard to these two events.
"[T]hey both testified that Anthony Christian wanted Brooker murdered, that
Ford agreed it should be done, and that Humphreys was assigned to do it.
Given that this plan was agreed to fifteen years prior to trial, this general
consistency about events and participants is a strong sign of credibility." Gov.
Br. at 30.

government concedes, that, initially, the dispute between Britt and Buddha was personal. Gov. Br. at 36. But, Britt continued, in sum and substance, that, at the time Harvey Christian and Britt drove around with masks covering their faces looking to kill Buddha, Buddha had "threatened the safety of the enterprise's members and its ability to sell drugs at its home base." <u>Id.</u> Accepting this version of the facts as true, as the jury must have, and, finding it not incredible after vigorous cross examination, as the Court must on Rule 29, there was sufficient evidence to convict Anthony and Harvey Christian of the conspiracy to murder Buddha. Sufficient evidence having been presented, the Court will not disturb the jury's findings and the convictions they support.

Serendipitously, the analysis and conclusion on this claim is a microcosm of all claims advanced by all defendants. For all of the foregoing reasons, defendants' Rule 29 motion is denied.

B. <u>The Rule 33 Motion</u>

1. <u>The Government's Disparagement of the Defense</u>

Anthony Christian first attacks the prosecution's rebuttal summation as improper for referring to the defense's attempts to impeach key government witnesses as a "classic defense tactic." AC Br. at 7-8. He argues that the reference cast the defense as "sleazy." For that impropriety, he demands a new trial.

The argument, charitably, is the figment of a vivid imagination. At no point did the government call the defense, or any individual defense counsel, "sleazy," or even remotely suggest it. To the extent the defense seeks review of the prosecution's use of the phrase "classic defense tactic" for prejudicial effect on the jury, the Court will review it.

As a preface, "[i]t is a 'rare case' in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required." United States v. Rodriguez, 968 F.2d 130, 142 (2d Cir. 1992) (quoting Floyd v. Meachum, 907 F.2d 347, 347 (2d Cir. 1990)). To determine whether a summation was improper, the trial court applies a three-factor test, considering: "(1) the severity of any misconduct, (2) the measures taken to cure the misstatements, and (3) their likely effect on the outcome." United States v. Forlorma, 94 F.3d 91, 94 (2d Cir. 1996). By that standard, a reference to the "tactics" used by defense counsel falls far short of the mark necessary to find any impropriety. See United States v. Marrale, 695 F.2d 658, 667 (2d Cir. 1982) (finding that a government admonition to the jury not to "be fooled" by the defense counsel's tactics was not improper); see also United States v. Perry, 643 F.2d 38, 51 (2d Cir. 1981) (finding that the government's characterization of the defense counsel's arguments as "desperate" and "struggling" was not improper). Moreover, directly after the government's

26

rebuttal came the Court's instruction reminding the jury that "whatever the lawyers say is not evidence," and that "[a]rguments by lawyers about what the other lawyer argued, are . . . to the extent possible, even less significant and are diversionary." Tr. at 2610-11. It is clear that a reference to defense "tactics" had little ultimate impact on the outcome of this trial. There was no purposeful misconduct, there was no prejudice. This argument thoroughly lacks merit and is dismissed.

## 2. The Government's Remarks on Felix Grant

In a similar line of attack, Anthony Christian argues that the government improperly represented Felix Grant's testimony to the jury during its rebuttal. In fact, both sides spoke to the jury about Grant. In closing argument for Anthony Christian, defense counsel said the following about Felix Grant:

> Now, just yesterday Felix Grant took the stand and it was interesting. I think it was yesterday, maybe the day before yesterday, whatever. And the Government got to that portion of the examination and asked: "Well, what does the agreement mean to you? "Well, I have to tell the Government what they need and then I'll get my testimony," just matter-of-factly. Just think about that, the phraseology: "I'm obligated to tell the Government what they need." The first words out of his mouth were: "I have to tell the Government what they need." That's what he's thinking. You saw the window into his mind.

Tr. at 2412. In its rebuttal, to which exception is now taken, the government responded:

27

Mr. Gold [counsel for Anthony Christian] told you yesterday that when I asked Felix Grant what he was required to do under his cooperation agreement, Mr. Gold told you that Mr. Grant responded that he was obligated to tell the Government what they need, "Just tell the Government what they need and I will get my letter." Look at the transcripts, ladies and gentlemen. This is page 2079, direct examination of Felix Grant.

"Question: Did you plead Guilty pursuant to an agreement?"

"Answer: Yes, sir."

"Question: What kind of agreement?"

"Answer: If I cooperate with the government, the government will write me a letter, if everything went according to. I told the truth and helped the government out, I will receive a letter at the end."

Mr. Gold told you yesterday that Mr. Grant made it seem that truth-telling was an afterthought and really what he had to do was give the Government what it needed, but that's not what the transcript said.

Tr. at 2570.

Christian claims he was referring to the portion of Grant's testimony that came soon after the portion of the testimony the government cited:

Question: And what does the letter say?

Answer: I worked with the Government. I provided all the information they needed and I kept my end of the bargain basically.

Tr. at 2605.

Anthony Christian objects most forcefully to the prosecution's use of the words "that's not what the transcript said." The government responds that, "in light of the full statements quoted . . . it is clear that what the

28

government argued the transcript did not say is that Grant viewed the truth as an afterthought, not that it did not contain the literal answer cited by defense counsel." Gov. Br. at 46. Resort to the sword of literalism by the defense badly misrepresents the prosecutor's rebuttal in context. If anything, it was not the government but defense counsel who misrepresented the transcript of Grant's testimony in context when he quoted Grant as stating, "I have to give the government what they need," rather than the past tense, "I provided all the information they needed." The two commentaries on Grant's testimony are materially different, as the former implies some sort of coercion, whereas the latter conveys a matter of fact, which is that Grant gave the government the information it needed. Of course, if it mattered to them, the jury could have resolved the conflict on its own. They were instructed that it was their recollections, not counsels', that controlled, Tr. at 2610-11, and that they had the right to request a read back of any portion of any testimony they felt they needed.

At any rate, the government's contextually accurate rebuttal of an argument the defense wanted the jury to take literally was in no way improper. Furthermore, even assuming, for the sake of argument, that this comment constituted misconduct on some level, it was so insignificant, in the scheme of the entire proceedings, to leave the Court confident that it did not

affect the outcome of the trial. Nor does it satisfy <u>Forloma</u>'s three-part test

warranting a new trial.

### 3. "Vouching" for Cooperating Witnesses

In his final salvo, Anthony Christian interposes the challenge that "the

government made an overarching argument that the jury should believe the

cooperators because they can be assured that the government did everything

within its power to corroborate and convince themselves that the witnesses

were telling the truth." AC Br. at 10. "In effect," Anthony Christian contends,

"the government advised the jury that they should trust the testimony because

the government did." <u>Id</u>. The government statement given in its rebuttal to

which Anthony Christian takes exception was as follows:

> Ladies and gentlemen, the Government takes our witnesses as we find
> them, but let me be very, very clear, I'm not playing hot potato with
> these cooperating witnesses. What's the expression, the buck stops here.
> We represent the United States Government. We have the burden of
> proof. The defendants chose these men, but we chose to call them as
> witnesses and to present their testimony to you, and we did that because
> we believed that their testimony was important, it was probative, it
> provided you with a more full sense of who these defendants are, what
> they were about, and what they did.

> That said, we didn't present their testimony lightly or cavalierly, or
> without regard to the crimes they've committed in their lives. At every
> turn when a cooperator told us something, agents and prosecutors went
> back and said what can we do to corroborate what we've been told?
> How can we establish that what we're hearing is actually true? When
> we have to present this case to a jury some day, they're going to have
> expected us to look under every rock, chase down every lead, and do
> everything that we can to confirm each and every possible fact that's

possible to confirm because we're going to be asking these jurors to make some very important decisions based on testimony from people who've committed some very serious crimes.

Tr. 2578-79.

It is hornbook that "[a]ttorney statements vouching for the credibility of witnesses are generally improper because they imply the existence of" evidence not before the jury. United States v. Perez, 144 F.3d 204, 210 (2d Cir. 1998) (quoting United States v. Rivera, 22 F.3d 430, 438 (2d Cir. 1994)). Prosecutorial "vouching," in particular, is improper because it "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." United States v. Newton, 369 F.3d 659, 681 (2d Cir. 2004) (quoting United States v. Young, 470 U.S. 1, 18-19 (1985)).  Nevertheless, "[w]hile the prosecution may not 'vouch' for the credibility of its witnesses, 'the government is allowed to respond to an argument that impugns its integrity or the integrity of its case, and when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion." United States v. Carr, 424 F.3d 213, 227 (2d Cir. 2005) (quoting United States v. Thai, 29 F.3d 785, 807 (2d Cir. 1994)). To grant a retrial on this ground, a trial court must find that the prosecutor's improper remarks "cause[d] the defendant substantial prejudice

31

by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999). In other words, the prosecutor's statements must constitute "flagrant abuse." United States v. Zichettello, 208 F.3d 72, 103 (2d Cir. 2000).

Plainly, the prosecution did not go outside the record to "vouch" for the credibility of the witnesses the government called to the stand. But, they did comment on the credibility of the cooperating witnesses they had called. Those are the statements the Court must judge, and, given the high hurdle erected by case law, Anthony Christian's argument stumbles fatally as he attempts to vault over it. At trial, defense counsel went after the cooperating witnesses' credibility hammer and tong, beginning with Brian Humphreys. In his closing argument, defense counsel told the jury:

> Doesn't matter what Brian Humphreys says. If you can't believe Brian Humphreys, you can't believe what he tells you, certainly not beyond a reasonable doubt. And ladies and gentlemen, if he told you this morning it was raining out and you're looking out the window and it's raining out, you'd still think to yourself, "Is it really raining? I better double check because if Humphreys is telling me it's raining, it probably isn't." Brian Humphreys is a liar. Paul Ford is a liar. And ladies and gentlemen, a liar lies, that's what he does.

Tr. at 2399-2400.

Similarly, like Anthony Christian's counsel, the summation by counsel for Harvey Christian asked the jury if it could find his client guilty "beyond a reasonable doubt based upon all of these lying cooperators[.]" Tr. at 2519.

32

Describing Brian Humphreys, he said: "This is a guy, ladies and gentlemen, who literally, as far as I could tell, has no conscience, has absolutely no concept of right and wrong, no concept of morality whatsoever," and also reminded the jury of "the voices in his head." Tr. at 2536-37. He ventured—without evidentiary support—that Humphreys "killed many more people" than those he had previously admitted to killing, resulting in the Court's admonition to "stick to the record." Tr. at 2541. He later added, "Humphreys told a million lies, Ford told a million lies." Tr. at 2562.

In light of defense counsels' persistence in arguing that the entire cohort of cooperating witnesses were liars, it was well within reasonable expectation that the prosecution would, and did, seek to respond to these arguments in its rebuttal. More critically, the prosecution's emphasis on its efforts to corroborate statements of its cooperators with their evidence, as well as its emphasis on the fact that the cooperating witnesses would lose their cooperation agreements if they lied to the jury, was well within the bounds of propriety. See Carr, 424 F.3d at 228-29 (government's assertion that cooperating witnesses had "no motive to lie" was not improper when considered against the backdrop of defense counsel's "persistent attacks" on their credibility); United States v. Rivera, 22 F.3d 430, 438 (2d Cir. 1994) (government's alleged "vouching" for cooperating witnesses was not improper

when considering defense counsel's assertion that they had fabricated testimony). In light of the relentless cross examination of and the closing assault on the cooperating witnesses, there is no merit to defendants' lament. The response by the prosecution was fair, suitable and noninflammatory. No new trial on this ground is warranted.

4.    **Request for a Kastigar Hearing**

Laboring at trial under the handicap of his proffer statements, Quinn now bemoans a perceived unfairness in the trial unique to him, asserting that the prosecution developed a "stealth strategy" to "sabotage the defense effort" founded upon his proffers. It is on that ground that he separately moves for a new trial. In particular, Quinn accuses the government of engaging in "misconduct" by prompting cooperating witness Lamar Goodwine to testify to information Quinn alleges the government become aware of only after his proffer statements. JQ Br. at 12-13. In the alternative, Quinn seeks a hearing under <u>Kastigar v. United States</u>, 406 U.S. 441 (1972), to ascertain where else the government may have obtained this information, which formed the basis of the government's case against him on racketeering acts two and six, and counts six and seven.

Neither <u>Kastigar</u> nor the provisions of his proffer agreement are of any help to Quinn. <u>Kastigar</u> applies only to testimony that is granted both use and

34

derivative-use immunity because it was compelled over an invocation of the
privilege against self-incrimination. Kastigar, 406 U.S. at 443-44; 18 U.S.C. §
6002.  Here, Quinn's proffer statements were not compelled, but were given
voluntarily, and in the presence of counsel, as part of an agreement that
explicitly provided that the statements would be granted use, but not
derivative use, immunity.  Gov. Br. at 60 (citing 6/15/2011 Proffer Agreement
¶ 3; 6/29/2011 Proffer Agreement ¶ 3) ("[T]he Office may use any statements
made my [Quinn] . . . to obtain leads to other evidence, which evidence may be
used by the Office in any state of a criminal prosecution . . . ."); see also,
United States v. Ramos, 685 F.3d 120, 127 (2d Cir. 2012) ("An individual who
makes self-incriminating statements without claiming the [Fifth Amendment]
privilege is deemed not to have been 'compelled' but to have spoken
voluntarily."). Because Quinn had no expectation of derivative-use immunity,
and because, contrary to his contentions now, any derivative use that might
have been reflected in Goodwine's testimony would not break the proffer
agreement, Quinn's request for a Kastigar hearing, as well as his request for a
retrial on this ground, are denied.

###  5.  Distortion of Grant Testimony

Quinn next argues that the government somehow "distorted" Felix
Grant's testimony to signal that Quinn and Harvey Christian were co-

workers, but cites only to Grant's proffer session with the government. He fails to cite to any part of the transcript to support his claim that something the jury heard was distorted. This claim is unsubstantiated and fails.

6. Relitigation of Pre-Trial and Trial Motions

The balance of Quinn's arguments consist of attempts to relitigate motions that were briefed and decided before trial, including the admissibility of evidence of Quinn's 1997 arrest for possession of 11 bags of cocaine and the triggering of a provision of Quinn's proffer agreement permitting those statements to be used against him at trial (a ruling in which Quinn, in principal part, prevailed).[6] These arguments offer no basis to vacate the jury's verdict, and his Rule 33 motion on these grounds, too, are denied.

Conclusion

In line with the foregoing, the defendants' motions under Rule 29 for a judgment of acquittal and, in the alternative, under Rule 33 for a new trial, are denied with respect to all counts and all racketeering acts and all defendants. All other pending trial motions, if any, are also denied.

The pre-sentence investigation by the United States Probation Office shall proceed in the ordinary fashion. After the resulting Pre-Sentence

---

[6] To the extent Quinn criticizes the Court for "chastis[ing] Quinn's counsel," it did so in an attempt to prevent the trigger of the waiver provision in the proffer agreement that likely would have resulted in the use of some, or all, of those statements against him.

36

Reports have been prepared, distributed, and reviewed by all parties, Case Manager William Villanueva shall calendar sentencing hearings on dates mutually convenient for the affected parties.

So Ordered.

Dated:      Brooklyn, New York          s/Eric N. Vitaliano
            June 24, 2015

                                        _____
                                        **ERIC N. VITALIANO**
                                        **United States District Judge**